15

THE FOX LAW CORPORATION, INC.
Steven R. Fox, SBN 138808
srfox@foxlaw.com
17835 Ventura Blvd., Suite 306
Encino, California 91316
Tel: 818.774.3545; Fax: 818.774.3707

Proposed Counsel for Debtor-in-Possession
Mini Mania, Inc.

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION

| | |
|---|---|
| In re | Case No.:2024-22456-11 |
| Mini Mania, Inc. | DCN: SRF 1 |
| | Chapter 11 |
| Debtor. | FIRST DAY DECLARATION OF JONATHAN HARVEY IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS |
| | Date : To be set<br>Time :<br>Place : |

I, Jonathan Harvey, declare as follows:

1.      I am the principal of Mini Mania, inc. ("Mini"), an S-Corporation headquartered in Nevada City, California. The Harvey Family Trust, of which I am a trustee, holds 100% of the stock in Mini. My statements are based on my personal knowledge. If called to testify concerning the contents of my declaration, I could and would do so competently. My business address is 870 Gold Flat Road, Nevada City, California.

I.

Personal Knowledge and Authentication.

2.      I perform many roles with the Debtor.  In general, I oversee business operations.  I oversee administrative functions.  I hire and fire employees. I oversee the safeguarding of the Debtor's financial books and records as well as its computer hardware and software.

3.      I have personal knowledge of the Debtor's business because I am the sole owner.  I have been with the Debtor since the early 2000s.

4.      Along with the company's bookkeeper, I am one of the custodians of the Debtor's books, records and documents.  The Debtor maintains records of its transactions in the regular course of business, and it is the Debtor's practice and procedure to maintain records and to record transactions, acts, and events at or about the time the transaction occurs.  The Debtor relies on these records in connection with its business dealings.   I oversee the safekeeping of business records including financial records.

5.      The Debtor has business records primarily as computer files.   Where a business record is maintained on a computer, there are safety features which help to keep business records secure.  For example, access to many records is limited.  Financial records as one example can only be accessed if one has the necessary password.  Only management level personnel have passwords for sensitive records such as financial records.  Other employees do not.  The computer is linked to a server.  The server backs up the data stored on the computer.  The server computer and attachments are maintained in a secured location.

6.      I have personal knowledge of the procedures for creating, receiving, maintaining, storing and retrieving documents and records.  Mini's business records are received, maintained, stored and retrieved in the ordinary course of the company's course of business.  It is the ordinary course of the business to receive, maintain, store and retrieve records including any business records attached as exhibits discussed

below.  People with knowledge of the records and any exhibits contained below recorded  or made these exhibits discussed below.  The records were recorded at or near the time of their receipt or creation in the ordinary course of business.  The exhibits discussed below are true and correct copies of what they appear to be.

II.

The Debtor's Background and the Road to Chapter 11.

7.     Mini was started decades ago by Donald Racine.  He had a vision that he could sell parts and provide certain services such as engine rebuilds for Mini Coopers.  He ran this business for a number of decades and developed a good reputation and a following.

8.     Mini was started because there was a need for replacement parts here in the US for the Classic British Mini Cooper.  Mr. Racine, was racing Mini cars in the mid 70's and found that there were no distributors of classic Mini parts in the US.  Beginning in the mid 1970s, he began building relationships with UK suppliers of classic Mini Parts and began importing parts into the US and providing technical expertise to the classic Mini community.  Over the years, the company expanded to provide parts for related classic British car marques (e.g. Triumph, Mini, Jaguar, Morris Minor and the Austin Bugeye Sprite and MG) that use many of the same parts that the Mini Cooper used.

9.     In 2003, Mini began supplying parts and technical expertise when BMW released the new Mini Cooper here in the US.

10.     In its nearly 50 year history, Mini Mania has been a mainstay in both the classic Mini Cooper community and the New BMW Mini Cooper communities by providing hard to obtain parts, technical expertise and supporting various clubs and groups throughout the US and Canada.  In 2022 Mini Mania acquired Seven Mini Parts - a classic Mini parts supplier - to expand not only our parts offering and technical expertise, but to also to combine the two US based classic Mini Cooper parts suppliers to increase potential purchasing power.  Mini Mania has been and is the

3

largest supplier of parts in the US for both the classic Mini cooper and the New BMW Mini Cooper. For many of the New Mini owners, they will reach out to Mini Mania first before they contact their local dealerships.

11.    Mini Mania provides a valuable service and a range of various parts to the classic British Mini community by providing parts and technical expertise here in the US instead of the customer having to contact suppliers in the UK for their parts and to answer technical questions. The same can be said for the New BMW Mini Community in that Mini Mania offers a wide range of parts and accessories that neither dealerships nor individual suppliers offer. For the classic Mini and the New BMW Mini Cooper we have strived to become the "one stop shopping experience" for all things Mini.

12.    I began to work for Mini in 2002. My family trust, in 2019, bought out Mr. Racine and acquired his ownership interest in Mini, not long before Covid 19 shut down the United States.

13.    Mr. Racine has kept a relationship with Mini since selling the business. He owns the building where Mini operates its business and Mini has used a workshop he owns. Under the sale agreement, Mini agreed to pay $480,000 to Mr. Racine in 90 equal monthly payments of $6,293.76. In what is termed a "Non-Recourse Secured Promissory Note", Mini granted a security interest in specified assets, including the shares of stock in Mini. Mr. Racine did not file a financing statement.

14.    As I noted above, in June, 2022, Mini acquired all inventory and other assets of an entity known as Seven Enterprises, Ltd. for $335,000. Mini paid $30,000 as a down payment with the balance to be paid in monthly payments of $5,720.86 over approximately 5 years at 4.75% interest. The agreement also provided that Mini would maintain a life insurance policy on me for the benefit of the seller. Pursuant to the terms of a security agreement, Seven Enterprises took a security interest in much of Mini's assets but it is unclear if it took a security interest in monies or accounts. It does not appear that Seven Enterprises recorded a UCC 1 financing statement.

15.     Mini began selling products on the Internet starting in 1996.  Its business grew across the United States as a result.

16.     Over a period of years, Mini found itself in financial and then legal difficulties.  Covid 19 impacted sales.  For the first couple of months, sales declined.  Then sales began to increase.  By later 2022, sales began to decrease. This impacted Mini because it had bulked up its operating costs during Covid 19 to handle the increased sales.  Costs were not dropped in response to the declining sales; Mini did not pivot quickly enough.  Coupled with the purchase of Seven Enterprises, Mini's finances were strained.

17.     Though the purchase of Seven Enterprises likely was the right step in 2022, as the purchase allowed Mini to merge the two largest supplies in the U.S., the cost (consisting of the down payment and the monthly payments) have taken their toll on Mini's cash flow.

18.     With cash flow problems, there was a need for money.  Mini has had a line of credit with Bank of America but following Covid, the line of credit was not enough. Merchant Cash Advance companies ("MCAs") found Mini beginning in January, 2022, and pestered me to enter into MCA agreements which I understood to be loans. When an MCA contract was emailed to me, a broker was on the phone to confirm that I had received the MCA contract.  Some pressured me to sign them immediately.

19.     From January to October, 2022, Mini obtained monies via MCA transactions and these obligations were paid off. I have come to learn that some of the liens recorded for these MCA loans were not terminated when the monies were repaid.

20.     Then White Road Capital, in October, 2022, made an MCA loan to Mini. Its papers state that it offered to pay $414,000 to purchase $558,486 of future receivables.  This transaction and the ones described below in my declaration were described to me by the MCAs and their brokers as loans though I understand that the MCAs assert they were purchasing future receivables.  How they can purchase

something already subject to prior liens such as Bank of America's lien is something I do not understand.  Mini paid $3,172 on a daily basis to White Road with the loan term being 180 days. White Road took a security interest in various assets and also took my guaranty.

21.     The fees White Road charged include the following:  An up-front $450 charge and $45 monthly to manage the loan, $5,000 as a default fee in the event of a default, a $5,000 fee if Mini entered into any transactions that related to what the agreement called the receipts, and there were more fees.  The loan was not $414,000 in one payment. Instead, the loan was made periodically in parts, perhaps dependent on the performance of Mini.  This transaction is curious in that Mini allegedly gave up $558,486 in future receipts for monies of $414,000 that would be paid periodically and which payment to Mini likely relied on Mini's payments to White Road. By summer, 2023, Mini, on the advice of Debt Savvy, a debt settlement company, had defaulted on the obligation to White Road having paid the obligation down to approximately $118,000.  The parties entered into a settlement agreement for Mini to pay a reduced sum which it could not pay.  Over time, Mini paid $474,313.95 direct to White Road and through Debt Savvy.

22.     In February, 2023, Mini entered into another MCA transaction with UFSWest d/b/a Unique Funding Services.  I had believed it was a loan.  Mini would receive $130,000 and pay $188,500 over a period of time at the rate of $7,540 per week.  Over time, Mini paid $161,694.00 directly and through Debt Savvy to Unique.

23.     In 2023, another MCA, Arena Source Funding loaned $293,000 and $20,000 to Mini.  Problems developed quickly.  Mini entered into a settlement agreement with Arena to pay it off at a reduced sum but Mini was unable to make these payments.  Arena's loans, like those of White Road, made Mini's financial situation more difficult as it disrupted cash flow as Arena took monies daily.  The settlement agreement did not help because Mini lacked the funds to pay Arena.  Over time, Mini paid $170,919.36 to Arena both directly and through Debt Savvy.

24.    Another MCA, FirstLine Advance, made a hard money loan to Mini of $35,000 in November, 2023.  Mini was to repay the loan by paying $52,500 with daily payments of $1,050. The contract states a daily interest rate. The loan term was 77 days.  Mini had to agree to pay an additional $299 monthly during the loan terms for a company knows as Merchant Link Partners, LLC to handle the daily withdrawals from Mini's bank account and to handle "reporting and deal tracking" for Firstline Advance.  Funds were withdrawn daily from Mini's bank account at $1,050 each day.  As with White Road and Arena the Firstline loan made things worse.  Mini paid off this first FirstLine loan, paying $52,500.00.

25.    Also in November, 2023, Mini borrowed funds from another MCA, Kapitus LLC. The contract states that Kapitus was purchasing $211,500 of future receivables for $150,000 with $146,250 to be given to Mini, paid at $2,714 weekly until paid. Kapitus took a security interest in what may be all assets of Mini.  $211,692 is the amount Mini would need to pay back.  Over time, Mini paid $37,996.00 directly to Kapitus on account of this loan. Kapitus has apparently not filed a financing statement.

26.    In January, 2024, Firstline made a second MCA loan to Mini for $65,000, of which Mini would receive $59,800 and pay to Firstline $96,200 at a daily payment rate of $1,202.50.  The funds were withdrawn daily at the rate of $1,202.50. The loan term was 114 days. Again Mini agreed to pay $299.00 monthly to Merchant Link Partners, LLC to handle the payments, reporting and deal tracking.  Over time, Mini paid $21,645.00 directly to Firstline on account of this second loan.

27.    I have come to realize that MCA monies are like cocaine.  Once you start, you cannot stop. MCAs make it easy to get into the habit.  That happened here.  The transactions disrupted cash flow.  Mini had orders coming in from customers but given the many thousands of dollars the MCAs were taking daily and weekly, Mini lacked the funds to purchase products that were not already in Mini's inventory. Mini could not deliver products for lack of money.  Mini lost sales and that impacted its gross receipts.

Mini has been holding customer deposits for products to be ordered and the delays have harmed Mini's reputation.

28.    While the MCAs deserve so much of the blame for Mini's financial problems, Mini already had some problems, such as drop off in sales following Covid 19 and the payments to Mr. Racine and to Seven Enterprises. The MCA transactions just took a difficult situation and exacerbated it.

29.    Another issue for the Debtor is that its inventory is heavy on certain items that customers may want occasionally but its inventory is light on general repair and maintenance items, e.g. brake pads, brake rotors, fluids, that customers currently want.

30.    During the past year, Mini has reduced its expenses. Over the course of the past year, it has laid off many employees and 3 additional employees retired and were not replaced. Mini still has 6 employees plus me. Two of the six remaining employees are part time.

III.

Reorganization.

31.    While Mini has had considerable difficulties, it can reorganize. Here is how.

- With the bankruptcy filing, Mini will not be paying prepetition debt. This will free up cash flow.

- So far, I believe that Mini has the support of key creditors.

- I am working with crucial suppliers to see if they will agree to continue to supply product that customers are asking for, even on a COD basis. I have been speaking with suppliers about our financial problems and letting them know about the bankruptcy filing.

- The bankruptcy filing will stop all MCA activities. I suspect that over time, MCAs took well over $1 million in monies from Mini.

- With the letting go of many employees, labor costs are reduced.

- Mini has reduced other expenses. Janitorial services were cut back, I reduced my salary for most of 2023 and did not take a salary for two months in 2024, until my savings went too low. I have reduced employee working hours. We reduced some marketing costs. Mini stopped using some outside marketing consultants.

- If Mini can afford to do so, Mini may pursue MCAs for fraudulent conveyances, for unconscionable contracts, for usury and other legal claims that Mini's counsel may develop.

- Mr. Racine was a Mini enthusiast. He races them. He will repair and rebuild Mini engines. This has been his love. I got into the business not only because I appreciate the beauty of the Mini but because I wanted a business that could support my family and also fund a retirement.

IV.

The Debtor's Income, Expenses, Assets and Liabilities.

A.    Income.

32.    The Debtor's gross receipts were $5,484,311 in year 2022, $3,419,091 in year 2023 and are $813,299 year to date. Its federal income tax return for year 2022 reflects a loss of $180,830.

B.    Expenses.

33.    Mini's expenses can be seen in the P&L statements for 2023 and for 2024 (YTD) that are attached. (Exhibits "A" and "B") Its expenses and anticipated receipts are also reflected in the attached weekly projection for the Debtor. (Exhibit "C")

C.    Assets.

34.    Mini's primary assets are the following:

- Monies which can run between $20,000 to $40,000.

- Receivables that presently are approximately $7,000. Mini typically has few receivables.

- Inventory with a likely value of about $858,000 if sold over a period of time. Much of this inventory is not currently desirable inventory so its value is somewhat uncertain.
- Confirmed orders for engine build work in progress with a value of about $86,000 if the work is completed.
- Vehicles and machinery and equipment valued at about $115,000 if sold over a period of time.

D. <u>Liabilities</u>.

35. Many financing statements were filed. They have been provided to me and I have read through them. Part of my task was to match up financing statements to loans. In some instances, the lender or MCA is not identified. Instead a company doing the filing is listed. I checked Mini's business records to figure out some of these filings but I could not figure out the lender or MCA behind all of the financing statements that were recorded.

36. I am learning that though a creditor may claim in contracts that it holds a security interests in assets of an account debtor, the creditor must also file a financing statement with the California Secretary of State. A number of entities have done so. I do not claim to have a good understanding of the concepts of priority and what makes a lien valid but my understanding is that the following entities claim that they are secured by assets of Mini. I also understand that to the extent that a creditor's lien does not actually reach any collateral, the creditor is effectively unsecured. My list below is not meant to be definitive. The names in the list below are for entities that assert interests in all assets, monies, accounts or make similar claims of security, whether the entities are or are not actually secured.

- 1st position: Bank of America
- 2nd position: American Express National Bank
- 3rd position: CHTD Company (as representative for unknown creditor). I am unable to connect this filing to any transaction.

- 4th position: CT Corp. Systems as representative likely for Fox Funding which was paid in full.
- 5th position: Amazon Capital Services
- 6th position: CT Corp. System as representative, likely for UFS
- 7th position: CSC as representative for (likely) GFE-White Road
- 8th position: CT Corp. Systems as representative likely for UFS West
- 9th position: Arena Funding Source, LLC
- 10th position: CT Corp. Systems as representative likely for Firstline Advance
- 11th position: Goldman Sachs Bank USA

37.    Mini will need time to determine with precision which financing statements attach to what assets.  Some taxes, though not a lot, are owed.  The Debtor has many unsecured creditors whose claims total some $2.8 million.  Unsecured claims will include entities that have filed financing statements but whose liens are effectively under-secured or completely unsecured.

38.    There are over 1,000 customers holding claims based on deposits for parts or other products including engines for Minis.  The Debtor intends to file a separate motion to address the deposits as well as gift cards and how and when the Debtor should handle these claims including their scheduling.

VI.

Request to use Cash Collateral.

39.    Mini seeks authority to use cash collateral pursuant to its projection.

40.    Mini needs to use cash collateral to operate its business, to pay employees, to pay rent and utilities, purchase products and to pay other expenses.  Without the use of cash collateral, Mini will be unable to remain in business.  If Mini cannot use cash collateral, its reputation in the industry will be severely harmed.  Authorizing the relief requested below will benefit the secured creditors as the use of cash collateral will protect their security.  If their security interest extend to Mini's

monies, then Mini does not have unencumbered sources of monies or other assets to pay ordinary course of business obligations.

41. <u>Variance</u>. I am one of the people who worked on the projection. We have done our best to make a reliable projection but budgeting is not an exact science, especially in light of the current economy. While I believe that the projection is reliable, I also know from experiences that there likely will be a lot of variance in the amount of business that Mini does during the period of the projection. Mini depends on customer orders that can come on short notice. Mini seeks variances from the proposed budget by as much as 20% in any category where the projected weekly spending is under $2,000 and by as much as 15% where the projected weekly spending is more than $2,000 weekly. These variances are reasonable given the small nature of the amounts involved and the cost of attorneys' fees if hearings are needed to seek variances. If Mini determines it needs to vary from any one budgeted item by more than the 15% or 20% variances, Mini proposes that it provide written notice by email or telecopier of the variance to Bank of America only. If the Bank does not object to the variance within 2 business days, then the variance will be deemed approved. If it does not consent, then Mini would seek a hearing on shortened notice.

42. <u>Rolling Unspent Expenses Forward</u>. The budget is a weekly budget. Mini will likely underspend in certain categories in some weeks. Mini requests that it be authorized to carry from previous weeks to future weeks any unused monies. Mini also requests that the monies carried forward not count toward the 20% variance. The rollover is important because Mini projects sales and revenues on a weekly basis but some sales and some revenue may come in one or two weeks later than projected. If that occurs, Mini may have insufficient monies in some categories to properly attend to rentals or to sales or to purchase replacement products.

43. <u>Application of Excess Gross Receipts to Costs of Goods Sold and to Expenses</u>. In some periods Mini's gross revenues may exceed projected gross revenues. While this is a good thing, this means that it will also have higher COGS

and more expenses.  If its gross revenues exceed projected figures, Mini requests that it be permitted to apply up to 75% of any excess gross revenues to COGS sold and the balance to expenses not tied to specific jobs.

44.    <u>The Creditors Asserting Interests in Assets Are Adequately Protected</u>.  They are afforded adequate protection of their claims in many ways.

a.    The value of the estate's assets.

b.    Mini continuing to operate the business and maintaining and servicing the inventory and equipment.

c.    Operating the business creates additional revenues.

d.    All assets are adequately insured.

e.    Providing replacements lien to the creditors to the extent their prepetition liens attached to property of Mini prepetition and with the same validity, priority, and description of collateral. Mini is not here waiving any right it may have to challenge any lien.

f.    While Mini does not at present plan to make any adequate protection payment offer for Bank of America, it hopes to begin making payments perhaps 6 months into the case when its finances have stabilized, when Mini has obtained products for sale and its ability to reorganize is clearer.

VI.

Emergency Motion to Authorize Debtor to Pay

Prepetition Priority Employee Wages.

45.    The Debtor employs about 6 employees.  The remaining employees provide crucial functions for Mini.  They inventory products, safeguard the inventory, handle sales and speak with customers.  They are the face of the company. They work on sales and administrative matters. Their knowledge of the business and their skills are essential for the Debtor's continued operation.  Without the employees there will be no business.

46.　　Payroll is paid on the 15th and the last day of the month. The payroll for the 15th covers the period 26th of the prior month through the 10th of the current month and the payroll for the last day of the month covers the period of the 11th of the current month through the 25th of the current month. The next payroll will be paid on the 15th of June. ADP is the payroll company.

47.　　I anticipate the June 15th payroll will be slightly lower than recent payrolls. The attached payroll reports are for the last three payroll periods. It is too soon for Mini to have a payroll report for the period that has not yet ended.

48.　　The three reports give good guidance as to the likely payroll to be paid on June 15th for the period ending June 10th. The reports are Exhibit "D".

49.　　Mini requests authority to deviate from estimated payroll by as much as 15% for any non-management level employee to account for overtime but will not pay any employee more then the allowed priority amount.

50.　　Normally, pre-bankruptcy debts are paid through the plan. The employees, if not paid, will not wait to be paid through the plan and instead will largely leave Mini's employment. This will severely impact Mini's reorganization and impact the value of the assets.

51.　　The employees are still employed. By paying the prepetition payroll, the employees will keep working and the Debtor will be able to honor its job commitments, meet company expenses and work to reorganize. The Debtor's prospects for reorganization are good. The Debtor has analyzed its financial and operational problems, identified reasons for cash flow problems, identified solutions and is beginning to implement them.

52.　　The Debtor will have funds to pay the payroll owed for the pay period as it collects monies regularly.

53.　　Mini seeks authority to: (a) pay all prepetition employee wages and other compensation of the remaining employees in an amount not to exceed the priority amount as to any one individual; (b) if there are any pre-bankruptcy expenses that

employees incurred (and I am unaware of any), then reimburse all prepetition employee business expenses of the remaining employees; (c) honor and pay all payments for which prepetition payroll deductions are due; (d) continue to honor and process any prepetition obligations with respect to payroll taxes on a post-petition basis; (e) pay all processing costs and administrative expenses relating to the foregoing payments and contributions; (f) make payments to third parties incident to the foregoing payments and contributions such as the Debtor's outside payroll company and for workers compensation insurance; and (g) honor other prepetition payroll checks that employees did not negotiate prepetition (but within the priority limit) but by collecting the prepetition uncashed checks, voiding them and insuring new post-petition payroll checks.

     Executed on June 4, 2024, at Nevada City, California.

     I declare under the laws of the U.S. of America that the foregoing is true and correct.

Jonathan Harvey